852 A.2d 98

**Richard J. WALK**

v.

**HARTFORD CASUALTY INSURANCE COMPANY.**

**No. 110, Sept. Term, 2003.**

Court of Appeals of Maryland.

June 16, 2004.

2

4

Mark H. Kolman (Jamila Z. Hoard, Dickstein, Shapiro, Morin & Oshinsky, LLP, on brief), Washington, DC, for Appellant/Cross–Appellee.

Richard W. Driscoll (Driscoll & Seltzer, PLLC, Alexandria, VA) on brief, for Appellee/Cross–Appellant.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, GREENE and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

RAKER, Judge.

This appeal arises out of an action filed in the Circuit Court for Howard County by Richard Walk against Hartford Casualty Insurance Company ("Hartford") alleging breach of contract and seeking damages as a result of Hartford's refusal to defend Walk in a lawsuit which had been filed against him. The Circuit Court granted summary judgment in favor of the insurer, finding no duty to defend because neither the allegations in the underlying action against Walk, nor the extrinsic evidence submitted by Walk, were sufficient to generate a potentiality of coverage under Hartford's policy (the "Policy"). The issue we must decide in this case is whether Hartford had a duty to defend Walk in a lawsuit brought against him by Victor O. Schinnerer & Company, Inc. ("Schinnerer"). We shall hold that there was no duty to defend Walk because there was no potentiality of coverage under the Policy. Accordingly, we affirm the judgment of the Circuit Court.

## I.

Appellant Richard Walk filed suit against Hartford alleging that Hartford breached the provisions of the Policy by refusing to defend Walk against the Schinnerer suit. In Count I, Walk sought damages for Hartford's failure to defend; in Count II, Walk sought damages for Hartford's failure to indemnify for the amounts resulting from an "advertising injury" that were the consequence of an underlying suit which Walk had settled.

Walk was insured under a policy issued by Hartford purchased by his employer IBSC East, LLC (IBSC East). IBSC East purchased a uniform Hartford Spectrum Business Insurance Policy for the period of April 26, 1999 through April 26, 2000. The Policy provided coverage for, among other things, business personal property, business liability, and employment practices, and included the Business Liability Coverage Form. Under the business liability coverage of the Policy, Hartford agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'advertising injury' to which this insurance applies" and "defend any 'suit' seeking those damages." An "advertising injury," as defined by the Policy, includes the copying in an advertisement of an advertising idea or style.

Walk was employed from October 1971 to May 31, 1999 by Schinnerer. In May, 1999, Walk left Schinnerer and went to work for IBSC East as CEO and President. Schinnerer underwrites professional liability insurance and risk management programs for real estate agents and other professionals. IBSC East is the east coast marketing arm and new business development coordinator for IBSC, Inc., a California-based corporation which, like Schinnerer, underwrites liability insurance for professionals. While employed with Schinnerer, Walk's primary focus was on marketing errors and omissions insurance, specifically structured for real estate agents. From 1989 to 1999, he was Senior Vice–President and Division Manager for Combined Programs, a large strategic business

unit, and also headed the real estate errors and omissions division of that unit.

As a senior executive of Schinnerer, Walk participated in stock plans which entitled him to receive option grants for shares of the company's common stock. As a condition precedent to the exercise of stock options, Walk was required to sign a non-solicitation agreement in which he promised to safeguard at all times the company's trade secrets and other confidential and proprietary information and refrain from soliciting clients of the company for a period of two years from the date of termination of employment. The non-solicitation agreement provided that, in case of any breach, monetary damages may include, but not be limited to, the gain realized on exercise of the option.

Walk signed non-solicitation agreements in September and October of 1997, prior to exercising options to acquire 17,925 shares of stock in Schinnerer's parent company, Marsh & McLennan Companies, Inc. (MMC).[1] In May 1999, Walk executed four additional non-solicitation agreements and exercised stock options to acquire 5,550 shares of stock. As a result of exercising these stock options, Walk realized a gain of $628,579.66.

Walk terminated his employment with Schinnerer on May 31, 1999 and signed a severance agreement on June 2, 1999, which included $294,330.77 as enhanced severance pay. The severance agreement provided that Walk would not use or disclose confidential or proprietary information at any time or for any purpose and that for a period of fifteen months after termination of his employment Walk would not solicit the company's clients.

On June 19, 2000, Schinnerer and two of its parent companies, the plaintiffs in the underlying action, filed suit against Walk in the Circuit Court for Howard County, Civil Action

---

1. Schinnerer is an indirect subsidiary of Marsh & McLennan Companies, Inc. ("MMC"). MMC owns Seabury & Smith, Inc. ("Seabury"), which is Schinnerer's parent company.

No. 13–C–00–045331 (the underlying action), alleging that Walk, in his employment with IBSC East, solicited Schinnerer's clients for IBSC's real estate errors and omissions liability insurance program and used Schinnerer's confidential and proprietary information, including its business and marketing plans. The complaint contained five counts. Counts I and II alleged that Walk breached the non-solicitation and severance agreements by soliciting Schinnerer's clients and using proprietary and confidential information for his benefit and that of his new employer. Count III alleged that Walk violated the Maryland Uniform Trade Secrets Act by misappropriating Schinnerer's trade secrets and using them for the benefit of IBSC. Count IV alleged that Walk breached his fiduciary duty to Schinnerer by disclosing confidential and proprietary information and by soliciting Schinnerer's clients for the benefit of IBSC. Count V alleged fraud related to the exercise of options. The plaintiffs sought to recover in damages the full amount of gain realized by Walk upon his acquisition of the stock that were the subject of the non-solicitation agreements, the amount of the severance pay paid to Walk, lost profits, and exemplary damages and attorney's fees.

The complaint did not allege or infer that Walk copied any advertising idea belonging to Schinnerer into a publication that is given widespread public distribution. Walk relies on evidence extrinsic to the complaint to support his argument that Hartford is required to defend him in the underlying action. He argues that the extrinsic evidence supports his argument that there is at least a potentiality of coverage.

During his deposition in the underlying suit, Walk answered questions about some of his activities while employed at IBSC East, including the transmission of communications to insurance brokers regarding real estate errors and omissions insurance being offered by IBSC. Walk stated that his secretary sent several hundred "blast faxes" [2] to brokers in six to eight states announcing the availability of IBSC's real estate errors

2. A "blast fax" is akin to a mass mailing by facsimile.

and omissions program outside of California. He also stated that he rewrote a press release for IBSC which announced the same thing and was sent to several insurance publications. Walk stated that he gave his secretary the names and addresses of between 100 to 200 brokers with whom he had dealt while employed by Schinnerer, and that the secretary sent the blast faxes to these individuals, among others.

Each blast fax was one side of one page and consisted of a headline, "Real Estate E & O Coverage For The New Millennium from IBSC Insurance Services & Associates Insurance Company," underneath of which were two columns of short bullet points describing the insurance. The bullet points included such information as limits of liability available and deductibles. The bottom of the page listed contact information for representatives of IBSC. Another blast fax was substantially the same but also listed contact information for Richard Walk at IBSC East. *See* apps. at 1–2. The press release was one side of one page and consisted of seven short paragraphs describing IBSC's origins, its new partnership with American Equity Insurance to provide a real estate errors and omissions insurance program nationwide, and the existence of IBSC East, headed by Walk. *See* app. at 3.

Walk notified Hartford of the claim and requested that Hartford defend him in the action.[3] Hartford declined, explaining that there was no coverage under the Policy for the claim. Walk continued to demand that Hartford undertake his defense. In correspondence with Hartford, Walk insisted that the plaintiffs' allegations that he had used their confidential and proprietary information to solicit their customers created the possibility that he could be found liable for causing "advertising injury" to the plaintiffs, thus triggering Hart-

---

**3.** Walk approached Hartford before the underlying lawsuit was filed. In April 2000, MMC wrote to Walk informing him that MMC and its subsidiaries believed that Walk had breached his non-solicitation agreements and demanding compensation for the breach. Walk forwarded the letter to Hartford. In May 2000, Hartford sent a letter to Walk stating that it found no coverage under its policy for any of the allegations contained in MMC's letter.

ford's duty to defend. As discovery in the underlying lawsuit progressed, Walk supplied Hartford with a copy of the deposition transcript and renewed his demand that Hartford provide him with a defense. Hartford maintained that it had no duty to defend Walk.

In February 2001, the plaintiffs offered to settle the underlying action. Walk again wrote to Hartford, referring Hartford to portions of the settlement offer letter about Walk's marketing efforts—the "blast faxes," "other advertising material," and "marketing brochures." Walk argued that the plaintiffs' claims implicated the "advertising injury" coverage of Hartford's policy. Hartford once more declared that the plaintiffs had not asserted a cause of action that would trigger Hartford's duty to defend. In May 2001, Walk settled the claims and paid the plaintiffs an amount stated in their confidential settlement agreement.

■ Before the Circuit Court for Howard County, Walk and Hartford filed cross-motions for summary judgment. The Circuit Court granted summary judgment in favor of Hartford, concluding that there was no potential that the plaintiffs in the underlying action had alleged an "advertising injury." [4]

---

4. Hartford argues that this appeal should be dismissed because the notice of appeal was filed untimely. We disagree.

The Circuit Court awarded summary judgment for Hartford on January 7, 2003. On February 11, 2003, Walk moved for final judgment, which was entered by the court on June 19, 2003. Hartford claims that the Circuit Court erred in granting the motion for final judgment. Hartford argues that the January 7, 2003 summary judgment order entered in its favor was a final judgment and because Walk failed to file a notice of appeal within thirty days after the entry of the order, as required by Maryland Rule 8–202(a), this appeal is not properly before this Court.

This Court has stated that, for a ruling or order to constitute a final judgment, it must: (1) be intended by the issuing court as an "unqualified, final disposition of the matter in controversy"; (2) "adjudicate or complete the adjudication of all claims against all parties"; and (3) be properly recorded by the clerk in accordance with Rule 2–601. *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767, 773 (1989). Rule 2–601 provides in relevant part as follows:

"(a) Prompt entry—Separate document. Each judgment shall be set forth on a separate document. Upon a verdict of a jury or a decision

The court concluded that the complaint did not allege that Walk used Schinnerer's ideas or proprietary information in an advertisement nor did the complaint claim that Walk or his new employer used advertisements in its business solicitations. In a Memorandum and Order, the Circuit Court stated as follows:

"[T]here is nothing in the Complaint that complains about any advertising by Walk or his new employer or by the use of confidential and proprietary information in advertisements prepared by them. The crux of the Complaint is the violations of the severance and non-solicitation agreements by Walk. There is nothing in the Complaint which asserts that Walk or his new employer used any of the Plaintiffs' materials or confidential information in advertisements."

---

by the court allowing recovery only of costs or a specified amount of money or denying all relief, the clerk shall forthwith prepare, sign, and enter the judgment, unless the court orders otherwise. Upon a verdict of a jury or a decision by the court granting other relief, the court shall promptly review the form of the judgment presented and, if approved, sign it, and the clerk shall forthwith enter the judgment as approved and signed. A judgment is effective only when so set forth and when entered as provided in section (b) of this Rule. Unless the court orders otherwise, entry of the judgment shall not be delayed pending determination of the amount of costs.

(b) Method of entry—Date of judgment. The clerk shall enter a judgment by making a record of it in writing on the file jacket, or on a docket within the file, or in a docket book, according to the practice of each court, and shall record the actual date of the entry. That date shall be the date of the judgment."

The Circuit Court granted Walk's motion for entry of final judgment because the court found a "sufficient ambiguity about the entry of the final judgment [on January 7, 2003]." The docket entry for January 7, 2003 read simply: "ordered from Judge without file January 7th, 03." The court stated:

"Well, what the clerk would ordinarily do is, put in that it is ordered the 7th day of January 2003, ordered the Plaintiff's motion for summary judgment is hereby denied and further ordered that Defendant's cross motion for summary judgment is granted, and that would appear on the docket as being entered. That has not occurred yet."

As the docket entry on January 7, 2003 did not comply with Rule 2-601, we conclude that the Circuit Court did not err in granting the motion for entry of final judgment, entered June 19, 2003. Because Walk filed a notice of appeal within thirty days of that date, the appeal is properly before this Court.

The court properly recognized that in Maryland, an insurer's duty to defend is not determined solely by the eight corner rule (reviewing the complaint and policy) but rather includes consideration of extrinsic evidence. The court found that "[e]ven considering the extrinsic evidence in a light most favorable to Walk, the Court does not believe that it potentially converted this action into one for 'advertising injury' that Hartford was obligated to provide a defense or coverage for under the policy in question." The court reasoned as follows:

"Walk's mere rewriting of a press release prepared by IBSC announcing its new line was not activity that, even under the greatest stretch of language or logic, could invoke the Policy. The conduct complained of was alleged to violate his non-compete agreement. There is no suggestion that the press release could in any way be an 'advertisement' as defined by the Policy, and there is no indication that the press release itself contained any 'advertising idea' of the Plaintiffs or caused 'advertising injury' to the Plaintiffs as defined by the Policy. The 'injury' it could have arguably caused to the Plaintiffs arises from Walk's alleged competitive activities on behalf of IBSC in violation of his contractual obligations. There is no suggestion that the content of the press release copied any 'advertising idea' or style of advertisement of Plaintiffs.

\* \* \*

[T]he Court discerns no allegations that the Plaintiffs in the underlying action were contending that their 'advertising ideas' or 'style of advertisement' were used in the faxes . . . Thus, there is no 'advertising injury' that potentially results from the faxes, even assuming that they can be construed to be 'advertisements.' Again, the problem with the faxes from the underlying Plaintiffs' point of view was that Walk engaged in the effort to send them out at all and used names and addresses he acquired in his former employment, actions which they allege violated their non-compete agreements.

Walk also makes references in his affidavit and memoranda to statements in discovery and the settlement letter and references to 'marketing materials' and 'advertising material.' *See, e.g.,* ¶ 19 of Walk Affidavit. Pulling stray phrases out of the letters and discovery relating generally to advertising does not, in this Court's view, convert the claims filed against Walk into ones for 'advertising injury.' " (Footnote omitted.)

Walk noted an appeal to the Court of Special Appeals. Prior to consideration by that court, this Court issued a writ of certiorari on our own initiative. *Walk v. Hartford Casualty,* 379 Md. 224, 841 A.2d 339 (2004).

## II.

To determine whether Hartford had a duty to defend its insured, we must decide whether the allegations in the underlying action potentially could fall within the scope and limitations of coverage for "advertising injury" under Hartford's policy.

Walk argues that Schinnerer's claim potentially was covered by the Policy because Schinnerer's allegations that he violated the non-competition agreements stem from advertising activity on his part. He maintains that Schinnerer alleged that he used its client lists, copied its marketing plans and ideas, and used that information in a nationwide sales effort involving a press release, blast faxes, magazine advertisements, and other means of public communications.

Hartford claims that the Circuit Court correctly determined that the complaint and extrinsic evidence established neither a potentiality of advertising injury, nor a reasonable potential that allegations of advertising injury would have been raised at trial. Hartford argues that there is no allegation in the underlying action that Walk copied, in an advertisement, an idea for an advertisement or the style of an advertisement. Hartford points out that the alleged use of business and marketing plans is not the same as copying an advertising idea into an advertisement. Hartford contends that blast faxes and

a press release do not meet the Policy definition of "advertise-ment." Even if they are advertisements, Hartford argues that Schinnerer never alleged anything with respect to the *content* of such advertisements and mentioned Walk's marketing ef-forts merely to prove that Walk breached contracts prohibit-ing him from soliciting Schinnerer's clients. Finally, Hartford asserts that Walk was not entitled to a defense because the Policy excludes any claim arising out of any breach of con-tract, except an implied contract to use another's "advertising idea" in your "advertisement," and Schinnerer's claims arose out of Walk's breach of the non-competition contracts.

## III.

As indicated previously, this matter was resolved in the Circuit Court on summary judgment. The standard of review is *de novo*. *See Jurgensen v. New Phoenix*, 380 Md. 106, 843 A.2d 865 (2004). The standard of review of a grant of summary judgment is whether the trial court was legally correct. *See Pelican Nat'l Bank v. Provident Bank of Mary-land*, 381 Md. 327, 849 A.2d 475 (2004). Whether summary judgment was granted properly is a question of law. *Id.* We reiterate that in reviewing a grant of summary judgment under Maryland Rule 2–501(e), we independently review the record to determine whether there exists any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Jurgensen*, 380 Md. at 114, 843 A.2d at 869. We review the record in the light most favorable to the non-moving party and construe any reasonable infer-ences which may be drawn from the facts against the movant. *Id.*

Because a policy of insurance is a contract, we construe it according to contract principles. *Mesmer v. M.A.I.F.*, 353 Md. 241, 725 A.2d 1053 (1999). The obligation to defend is a contractual one. *Id.* at 258, 725 A.2d at 1061. Unless there is an indication that the parties intended to use words in the policy in a technical sense, the terms of the contract are accorded their customary, ordinary, and accepted

meanings. *See Lloyd E. Mitchell, Inc. v. Maryland Casualty,* 324 Md. 44, 56, 595 A.2d 469, 475 (1991); *Cheney v. Bell National Life,* 315 Md. 761, 766, 556 A.2d 1135, 1138 (1989).

 Our task in this case is to decide whether the insurer, Hartford, had a duty to defend the insured, Walk. As Judge Chasanow pointed out, writing for the Court in *Aetna Casualty & Surety Company v. Cochran,* 337 Md. 98, 651 A.2d 859 (1995), to determine whether an insurer has a duty to defend an insured in accordance with the principles set out in *Brohawn v. Transamerica Insurance Company,* 276 Md. 396, 408, 347 A.2d 842, 850 (1975), we engage in a two-part inquiry, answering the following two questions:

"(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action [underlying action] potentially bring the tort claim within the policy's coverage?"

*Cochran,* 337 Md. at 103–04, 651 A.2d at 862 (quoting *St. Paul Fire & Mar. Ins. v. Pryseski,* 292 Md. 187, 193, 438 A.2d 282, 285 (1981)).

 At the outset, it is important to note that an insurer's duty to defend is distinct conceptually from its duty to indemnify, *i.e.,* its obligation to pay a judgment. *See T.H.E. Ins. v. P.T.P. Inc.,* 331 Md. 406, 628 A.2d 223 (1993); *cf. BGE Home v. Owens,* 377 Md. 236, 833 A.2d 8 (2003). One major distinction is that the duty to defend depends only upon the facts as alleged, and the duty to indemnify depends upon liability. *See Litz v. State Farm,* 346 Md. 217, 225, 695 A.2d 566, 570 (1997). Moreover, the duty to defend is broader than the duty to indemnify. *Id.* at 225, 695 A.2d at 569.

 An insurance company has a duty to defend its insured for all claims that are potentially covered under the policy. *See Brohawn,* 276 Md. at 407–08, 347 A.2d at 850. Judge Eldridge, writing for the Court, stated as follows:

"The obligation of an insurer to defend its insured under a contract provision ... is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a

claim covered by the policy, the insurer has a duty to defend. Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy."

*Id.* at 407–08, 347 A.2d at 850 (citations omitted). In *Cochran,* we pointed out that potentiality of coverage under the policy may be established by an insured through extrinsic evidence by demonstrating that "there is a reasonable potential that the issue triggering coverage will be generated at trial." 337 Md. at 112, 651 A.2d at 866. An insured may rely on extrinsic evidence where the underlying complaint "neither conclusively establishes nor negates a potentiality of coverage." *Id.* at 108, 651 A.2d at 864. If there is any doubt as to whether there is a duty to defend, it is resolved in favor of the insured. *Id.* at 107, 651 A.2d at 863–864. Nonetheless, in permitting the use of extrinsic evidence to establish a potentiality of coverage, we made clear that an insured cannot assert a frivolous defense to establish an insurer's duty to defend. *Id.* at 111–12, 651 A.2d at 866. "Only if an insured demonstrates that there is a reasonable potential that the issue triggering coverage will be generated at trial can evidence to support the insured's assertion be used to establish a potentiality of coverage under an insurance policy." *Id.*

Under the terms of the Policy, Hartford had a duty to defend Walk only if the Schinnerer complaint and the extrinsic evidence claim an "advertising injury." We turn to the language of the Policy to determine the scope and limitations of the coverage. The relevant terms are defined in the Policy. The Policy, Form SS 00 08 02 98, provides coverage for business liability as follows:

"We will pay those sums that the insured becomes legally obligated to pay as damages because of ... 'advertising injury' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages."

"Advertising injury" is defined in the policy as "injury arising out of one or more of the following offenses":

"c. Copying, in your 'advertisement', a person's or organization's 'advertising idea' or style of 'advertisement.' "[5]

"Advertisement" is defined in the policy as follows:

"a dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

a. (1) Radio;

(2) Television;

(3) Billboard;

(4) Magazine;

(5) Newspaper; or

b. Any other publication that is given widespread public distribution."

"Advertising idea" is defined as "any idea for an 'advertisement.' "

The Policy requires that the underlying plaintiffs allege the potential for three things: (1) an "advertisement"; (2) an "advertising injury," which entails the copying of an advertising idea or style into an advertisement; and (3) a causal relationship between the advertising injury and the alleged damages.

We hold that the Circuit Court concluded correctly that Hartford did not have a duty to defend the suit by Schinnerer against Walk, the insured, because Walk cannot establish a potentiality of coverage. Neither the complaint nor extrinsic evidence shows that Schinnerer claimed an "advertising injury." Schinnerer never alleged that Walk copied any of its advertising ideas or styles in an advertisement. Allegations that Walk engaged in advertising and used confidential information belonging to Schinnerer in the course of

---

**5.** In his memorandum of law in support of his motion for summary judgment in the Circuit Court, Walk also asserted that there is a potential for coverage under the definition of "advertising injury" as an injury arising out of "d. Infringement of copyright, slogan, or title of any literary or artistic work, in your 'advertisement.' " He appears to have abandoned his reliance on "d" in this appeal.

soliciting its clients are insufficient to show that the plaintiffs claimed an "advertising injury," as the term is defined in the Policy, or that the plaintiffs would have raised the issue of an "advertising injury" at trial.

The complaint, discussing "Walk's Breaches of the MMC Non–Solicitation Agreement and of the Severance Agreement," alleges as follows:

"Walk has been actively engaged in direct competition with Schinnerer by, among other things, directly soliciting Schinnerer's clients, which include both brokers and insureds, to terminate their relationships with Schinnerer and/or to place some or all of their business with IBSC ... In the course of soliciting these clients, Walk has inevitably used proprietary and confidential information he acquired as an employee of Schinnerer for the benefit of his new employer which also violated the terms of the MMC Non–Solicitation and Severance Agreement. This confidential and proprietary information includes, without limitation, Schinnerer's business and marketing plans; pricing of insurance programs; compensation paid to Schinnerer's brokers; policy expiration dates; and other risk management information."

The complaint does not allege or infer that Walk copied any advertising idea belonging to Schinnerer into a publication that is given widespread public distribution. In fact, the complaint contains no mention of advertisements. The crux of the allegations in the complaint is that Walk violated numerous agreements with his former employer not to solicit its clients or use its proprietary information. That the complaint leaves open or even suggests the possibility that Walk advertised his services, does not demonstrate a potentiality that the plaintiffs sued Walk for copying an advertising idea or style. Although the plaintiffs need not have used the words "advertising injury," or labeled a count in the complaint as "advertising injury," Walk cannot establish potentiality of coverage unless the plaintiffs alleged, in substance, an "advertising injury" as that offense is defined in the Policy. The plaintiffs made no such allegations in the complaint.

 Recognizing that the complaint by itself may not trigger a duty to defend, Walk asks this Court to evaluate extrinsic evidence, including his deposition testimony, Schinnerer's answers to interrogatories, and a settlement demand letter from Schinnerer's counsel. Walk relies on excerpts from his deposition in which Schinnerer's counsel asked him about his involvement in creating and sending out a press release and blast faxes. Walk points out that Schinnerer characterized the blast fax as an "advertisement." He notes that Schinnerer alleged, in one of its answers to interrogatories, that he wrote a press release and "sent 'blast faxes' and other solicitation letters to brokers who were clients of Schinnerer in an attempt to obtain business from them for IBSC." Walk also relies on language in Schinnerer's settlement demand letter, which summarized Schinnerer's claims as follows:

"Mr. Walk has admitted, among other things, that he supplied the names and addresses of Schinnerer's clients for 'blast faxes' and other advertising material sent by IBSC, Inc. ("IBSC"). These marketing materials announced the availability of IBSC's real estate errors and omissions insurance program and even listed Mr. Walk as the contact person for the program on the East Coast at IBSC East, LLC. Mr. Walk also has admitted that he sent out marketing brochures to Schinnerer's clients and facilitated and participated in meetings between several of Schinnerer's clients and the principals of IBSC in an attempt to solicit business from those clients. As a result of Mr. Walk's marketing efforts, some of Schinnerer's clients placed business with IBSC. Therefore, Mr. Walk not only attempted to solicit Schinnerer's clients but also succeeded in doing so in some instances."

None of the extrinsic evidence establishes a potentiality of advertising injury. Like the allegations in the complaint, the allegations in these supporting documents establish at most the potentiality for an advertisement. The Circuit Court assumed *arguendo* that blast faxes of the type sent by Walk's office and that Walk was alleged to have participated in

sending could be an "advertisement" as defined by the Policy.[6] Whether a blast fax, marketing brochure, press release, or other material used by Walk to market his services potentially is the equivalent of an "advertisement" as defined by the Policy need not concern us because, assuming that such materials are "advertisements," Walk has failed to show allegations of an "advertising injury."

The "advertising injury" provision of the Policy invoked by Walk deals with the offense of "[c]opying, in your 'advertisement', a person's or organization's 'advertising idea' or style of 'advertisement.'" Thus, the offense requires more than the existence of an advertisement; no offense occurs unless an advertising idea or style is duplicated in an advertisement. The policy language "[c]opying, *in* your 'advertisement'" indicates that the injury involves placing discrete images or text in an advertisement—*i.e.*, it is the *content* of the advertisement which matters. (Emphasis added.)

Schinnerer's assertions in the extrinsic evidence offered by Walk reveal no concern about the content of Walk's advertisements. Rather, the crucial fact that Schinnerer attempted to elicit in discovery and mentioned in its interrogatories and settlement offer was that Walk reached out to particular individuals with the aim of soliciting their business. Schinnerer necessarily mentioned Walk's advertising activities, such as blast faxes, because proof of this outreach to Schinnerer's clients is a way of showing that Walk solicited them. The method by which Walk solicited clients was, coincidentally, advertising. Had Walk engaged in face-to-face solicitation of clients, Schinnerer would have focused its allegations on that type of activity instead. Another way to phrase Schinnerer's

---

6. Although both parties in the Circuit Court agreed that there existed no dispute as to any material fact, Hartford contended that a "blast fax" cannot be an advertisement because, in the language of the Policy, it is not a "publication that is given widespread public distribution." Because the court determined that even if there existed an "advertisement," there was no "advertising injury," the Court assumed for the purposes of summary judgment that the "blast faxes" were advertisements.

allegations would be to state that, through the use of advertisements, Walk caused "solicitation" or "competition" injury. It is simply not the case that, through the use of advertisements, Walk caused "advertising injury."

Nor is the allegation that Walk used Schinnerer's "business and marketing plans" in the course of soliciting clients equivalent to an allegation that Walk copied an advertising idea or style in an advertisement. A business or marketing plan is not the same thing as an "idea for an advertisement." Further, it strains common sense to suggest that a marketing plan could or would be copied in an advertisement. Although the use of confidential marketing plans would be in violation of the severance and non-solicitation agreements, the use of marketing plans was not an injury or offense covered by the Hartford policy. Assuming *arguendo* that a marketing plan meets the definition of "advertising idea," Schinnerer never asserted that a marketing plan was copied in an advertisement.

Under *Cochran*, an insured may establish a potentiality of coverage under an insurance policy through the use of extrinsic evidence. Potentiality of coverage may be shown through the use of extrinsic evidence so long as the insured shows that there is a reasonable potential that the issue triggering coverage will be generated at trial. *Chantel Associates v. Mount Vernon*, 338 Md. 131, 141–42, 656 A.2d 779, 784 (1995) (quoting *Cochran*, 337 Md. at 112, 651 A.2d at 866). We cautioned in *Cochran* that "an insured cannot assert a frivolous defense merely to establish a duty to defend on the part of his insurer." 337 Md. at 112, 651 A.2d at 866. Moreover, as Judge Harrell noted, writing for the Court of Special Appeals in *Reames v. State Farm Fire and Casualty Insurance*, 111 Md.App. 546, 683 A.2d 179 (1996), as to the use of extrinsic evidence:

"This extrinsic evidence must, however, relate in some manner to a cause of action *actually alleged* in the complaint and cannot be used by the insured to create a new, unasserted claim that would create a duty to defend. Unas-

serted causes of action that could potentially have been supported by the factual allegations or the extrinsic evidence cannot form the basis of a duty to defend because they do not demonstrate 'a reasonable potential that the issue triggering coverage will be generated at trial.' "

*Id.* at 561, 683 A.2d at 186 (emphasis added).

The extrinsic evidence in the instant case contains not even a suggestion of any "style" of advertisement. Although it is possible that both Walk and Schinnerer relied on the blast fax for dissemination of information about their services, that advertising medium was not a proprietary idea belonging to Schinnerer and so cannot be characterized as an advertising style of Schinnerer. Assuming *arguendo* that an advertising medium can be equated with an advertising style, Schinnerer did not allege that Walk *copied* any advertising medium.

Under Walk's theory, whenever a former employee violates a non-competition agreement by soliciting clients using confidential information the employee learned in his or her former employment, and engages in any form of advertising, these circumstances automatically create the potential of an "advertising injury" under the Hartford policy or any other policy containing the same definition of "advertising injury." This theory stretches the concept of "potentiality" of coverage too far. As the Circuit Court explained, general references to marketing materials are insufficient to "convert the claims filed against Walk into ones for 'advertising injury.' " Walk's assertion of a potential advertising injury has no basis in either the complaint or extrinsic evidence. Because Schinnerer never asserted that anything was copied in an advertisement, Walk cannot establish a potentiality of an advertising injury or the reasonable potential that the issue of an advertising injury would have been generated at trial.

Walk relies on *Sentex Systems v. Hartford Accident & Indemnity Company*, 93 F.3d 578 (9th Cir.1996), in which the United States Court of Appeals for the Ninth Circuit held that the insurer breached its duty to defend the insured. In *Sentex Systems*, the plaintiff in the underlying action alleged

in its complaint that the insured had induced one of its employees to breach his non-competition agreement with the plaintiff and that the insured, through its employee, misappropriated the plaintiff's trade secrets, including its marketing techniques, and used the information to solicit the plaintiff's customers. The insurance policy provided that the insurer would pay for "sums that the insured becomes legally obligated to pay as damages because of ... 'advertising injury' to which this insurance applies." "Advertising injury," as defined by the policy, included injury arising out of "[m]isappropriation of advertising ideas or style of doing business." Noting that the policy's language did not limit itself to the misappropriation of an actual advertising text and that the concept of advertising included a broad range of direct and indirect advertising strategies, the court concluded that the underlying action raised a potential for liability under the "advertising injury" provision of the policy. *Sentex Systems,* 93 F.3d at 580–81.

*Sentex Systems* does not support Walk's position because the insurance policy in that case defined "advertising injury" differently than the Policy does in the instant case. Whereas misappropriation of advertising ideas was sufficient to trigger a duty to defend under the *Sentex Systems* policy, and such misappropriation was alleged to have occurred, the Policy in the instant case requires the copying of an advertising idea or style in an advertisement, which was not alleged to have occurred. Under the policy in *Sentex Systems,* the plaintiff was not required to allege the copying of an advertising idea or style in an advertisement. As Hartford points out, the Policy in the instant case does not include coverage for "misappropriation of advertising ideas," and Hartford had intentionally revised the Policy language to eliminate the possibility for coverage of a mere "misappropriation" of an advertising idea.

Walk cannot demonstrate a reasonable potential that the issue of an advertising injury would have been generated at trial. Even assuming that Walk's actions could have supported a claim of advertising injury by a hypothetical plaintiff,

the plaintiffs never asserted such a claim in the instant case. All of the counts in the Schinnerer complaint relate to Walk's alleged competitive activities in soliciting Schinnerer's clients and his use of Schinnerer's confidential and proprietary information in the course of the solicitation. The extrinsic evidence lays out the same claims. The abstract possibility that Walk could have copied in an advertisement an advertising style or idea belonging to Schinnerer, in the absence of a reasonable potential that such a claim would have been generated at trial, fails to establish potentiality of coverage.

*JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

## APPENDIX 1

### REAL ESTATE E&O COVERAGE FOR
# THE NEW MILLENNIUM

from

**IBSC** *INSURANCE SERVICES*

&

American Equity Insurance Company

| | |
|---|---|
| ➤ Best s A+ IX Rating | ➤ Zero Deductible |
| ➤ Defense Costs Outside the Limits | ➤ Construction/ Development Coverage |
| ➤ Fair Housing Coverage to $250,000 | ➤ Agent Owned Properties Coverage |
| ➤ Environmental Hazards Coverage to Full Limits | ➤ 50% Deductible for Risk Management |
| ➤ Seller's E&O Coverage | ➤ Aggregate Deductible |
| ➤ 20% Down, 10 Installments | ➤ $50,000 Lockbox Coverage |

## WE WANT YOUR BUSINESS, EXPECT OUR CALI

*IBSC Insurance Services, Inc.*
*11234 El Camino Real, Suite 200*
*San Diego, CA 92130* 500128
*800-477-9192 858-314-1334 (fax)*
*Contact Leonard Ryder (ext. 215), John Lowe (ext. 225) or Michael Ryder (ext.204*

## APPENDIX 2
### 'REAL ESTATE E&O COVERAGE FOR
# THE NEW MILLENNIUM

from

 **INSURANCE SERVICES**

&

 **Associates Insurance Company**

| | |
|---|---|
| ➤ Best's A+ IX Rating | ➤ Zero Deductible |
| ➤ Defense Costs Outside the Limits | ➤ Construction/ Development Coverage |
| ➤ Fair Housing Coverage to $250,000 | ➤ Agent Owned Properties Coverage |
| ➤ Environmental Hazards Coverage to Full Limits | ➤ 50% Deductible Credit for Risk Management |
| ➤ Seller's E&O Coverage | ➤ Aggregate Deductible |
| ➤ 20% Down, 10 Pay or 40%/30%/30% | ➤ $50,000 Lockbox Coverage |

*IBSC Insurance Services, Inc.*
*11234 El Camino Real, Suite 200*
*San Diego, CA 92130*
*800-477-9192 858-314-1334 (fax)*
*John Lowe (ext. 212)*

*IBSC East Insurance Services, Inc.*
*3060 Washington Road, Suite 240*
*Glenwood, MD 21738*
*888-810-6077 301-854-6378 (fax)*
*Richard Walk*

500129

# APPENDIX 3

IBSC PRESS RELEASE August 4, 1999

## IBSC Launches Nationwide Real Estate Agents E&O Program

August 4, 1999. San Diego CA based IBSC Insurance Services, Inc. today announced the launching of a nationwide Real Estate Agent s errors and omissions insurance program.

After a decade of providing cutting edge coverage and innovative risk management services to agents in California IBSC has teamed with Scottsdale, AZ based American Equity Insurance Company (Best s A+ IX) to offer their unique approach to this line nationwide. Said IBSC President Michael S. Ryder. We listened to our real estate customers to determine the coverage they will need as they strive to remain competitive into the next millennium. The sale of agent owned properties, construction/development coverage and Seller's E&O are just a few of the areas where we intend to meet the expanding needs of our customers."

Douglas Rutherford, Senior Vice President of American Equity echoed Mr. Ryder's comments and added, "We have worked with IBSC for almost two years and they have continually impressed us with the quality of their underwriting, systems and risk management efforts. Success in the difficult California market has convinced us that our partnership can offer a distinct difference to brokers and their customers nationwide

For more information please contact Leonard Ryder (ext. 215), John Lowe (ext. 225), or Michael Ryder (ext. 204) at 800-477-9192, 858-314-1334 (fax). IBSC Insurance Services, Inc., 11234 El Camino Real, Suite 200, San Diego, CA 92130

For more than a decade, IBSC Insurance Services has provided innovative insurance products and risk management solutions for its professional liability clients. IBSC initially established its reputation as the leading provider of Real Estate Agents Errors & Omissions in California and has since expanded that program nationwide. IBSC also underwrites and markets Lawyers and Accountants professional liability through various insurance companies.

IBSC's underwriting management operations are headquartered in San Diego, California and it has recently opened an East Coast marketing facility in Glenwood, Maryland.

Richard J. Walk has joined IBSC East, LLC, of Glenwood, Maryland, as President and CEO. Previously, Mr. Walk held the position of Senior Vice President at Victor O. Schinnerer & Co., Inc. of Chevy Chase, Maryland. IBSC East is the east coast marketing arm and new business development coordinator for San Diego based IBSC Insurance Services. IBSC serves as the underwriting manager for multiple professional liability programs available nationwide through various carriers.