899 A.2d 956

**Frank M. MOSCARILLO**

v.

**PROFESSIONAL RISK MANAGEMENT
SERVICES, INC., et al.**

**No. 2471, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 2, 2006.

Steven E. Fagell (David L. Meyer, Harry B. Roback, Covington & Burling, on brief), Washington, DC, for appellant.

Edward M. Buxbaum (Whiteford, Taylor & Preston, on brief), Baltimore, Andrew E. Vernick (J. Kristen Moore, Wharton, Levin, Ehrmantraut & Klein, P.A., on brief), Annapolis, for appellee.

Panel KRAUSER, MEREDITH, and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

KRAUSER, J.

Appellant, Frank M. Moscarillo, M.D., a psychiatrist, and his patient, Evelyn Toni Mulder, were sued in the United States District Court for the District of Columbia by Mulder's employer, William M. Mercer, Inc. ("Mercer"), and its parent company, Marsh & McLennan Companies, Inc. ("Marsh & McLennan"), for fraud and conspiring to defraud. Mercer and Marsh & McLennan claimed that appellant had, in connivance with Mulder, misdiagnosed Mulder as suffering from "Major Depression" so that she could wrongfully collect short-term disability benefits. Because appellant was sued for fraud and not negligence, his professional liability insurance carrier, appellee Legion Insurance Company ("Legion"),[1] denied coverage and declined to represent him.

When the Mercer suit was dismissed, appellant sought to recover the legal expenses he had incurred by filing a declara-

---

1. Legion was declared insolvent and ordered liquidated effective July 28, 2003, by the Commonwealth Court of Pennsylvania.

tory judgment and breach of contract action in the Circuit Court for Montgomery County against the now insolvent Legion, and appellee Property and Casualty Insurance Guaranty Corporation ("PCIGC"), an entity that was created by the General Assembly to address the unpaid obligations of insolvent insurers.[2] In that suit, he also named as a defendant appellee Professional Risk Management Services, Inc. ("PRMS"), the producer and administrator of his policy.

When appellant filed a motion for partial summary judgment, appellees responded with cross-motions for summary judgment, claiming, among other things, that they had no duty to defend appellant in the Mercer case. The circuit court agreed and granted appellees summary judgment.

Challenging that decision, appellant contends that, under his insurance policy, Legion had a duty to defend him in the Mercer litigation. Although sued for fraud and conspiracy to defraud, neither of which was covered by the Legion policy, he claims that appellees had a duty to defend him because the Mercer plaintiffs "clearly intended to prove at trial [his] alleged negligent acts." Nor was that duty obviated, he maintains, by the policy's fraud exclusion. That exclusion, he insists, applied only to fraudulent acts actually committed by an insured and not "to unproven allegations of fraud." Finding no merit to appellant's first contention, we need not reach his second to conclude that the judgment of the circuit court should be affirmed.

## The Policy

On November 4, 1998, appellant purchased a "claims-made" professional liability insurance policy from Legion, which was retroactive to May 1, 1996. It provided that Legion would "pay on behalf of an Insured all sums which the Insured shall become legally obligated to pay as Damages arising out of a Medical Incident, to which this policy applies." It further

---

**2.** Subject to certain statutory limitations, PCIGC stands in the shoes of Legion and is liable for claims that appellant could have brought against Legion.

provided that Legion had a "duty to defend any Claim or Suit against an Insured for Damages which are payable under the terms of this policy, even if any of the allegations of such actions or proceedings are groundless, false, or fraudulent."

In the Legion policy, a "Claim" meant "a written demand received by an Insured for money including the service of Suit, demand for arbitration or the institution of any other similar legal proceeding to which this policy applies"; "Damages" included "any compensatory amount which an Insured is legally obligated to pay for any Claim to which this insurance applies"; and a "Medical Incident" encompassed "any negligent act or omission in the furnishing of Psychiatric Services by a Named Insured or any person for whose acts or omissions the Named Insured is legally responsible."

The Legion policy contained several exclusions, but only one is at issue here. That exclusion provided: "This policy does not apply to: . . . '[a]ny Claim arising out of or in connection with any dishonest, fraudulent, criminal, maliciously or deliberately wrongful acts or omissions, or violations of law committed by an Insured.' "

### The Mercer Litigation

On February 24, 1999, Mercer and Marsh & McLennan, Mercer's parent company, filed suit in federal district court against appellant and his patient, Evelyn Toni Mulder, alleging fraud and conspiracy to defraud in connection with Mulder's application for and receipt of disability benefits. The complaint stated that Mercer hired Mulder as an actuary in 1992. On February 27, 1997, the head of Mulder's practice group, Henry Essert, met with Mulder to advise her that, as part of Mercer's restructuring plan, her office was to be closed. Two months later, he sent Mulder a letter offering her a severance package and notifying her that her employment would end on May 31, 1997.

Two weeks after that letter was sent, on May 22, 1997, Mulder sought treatment from appellant, a psychiatrist. She continued to see appellant during the spring and summer of

that year. During that time, appellant prescribed Prozac and other antidepressants for her. By June, appellant had concluded that Mulder was suffering from major depression. That diagnosis enabled Mulder to apply for and receive disability benefits under the Marsh & McLennan benefit plain.

According to the Mercer complaint, three weeks later, on June 23, 1997, Mulder told appellant about the employment dispute she was having with Mercer. At that time, appellant and Mulder "completed" Mulder's application for short-term disability benefits. The application stated that Mulder had major depression and had been unable to work since May 14, 1997. In July and August of 1997, appellant purportedly told a disability coordinator and a health care consultant for Marsh & McLennan that Mulder had not yet recovered from that depression.

The Mercer complaint further alleged that on October 23, 1997, a senior Mercer human resources representative told Mulder that, consistent with Mercer's original decision, there was no longer any position for her at Mercer; her disability benefits were terminated effective November 1, 1997. On October 31st, the day before her benefits were to end, Mulder sent a letter to Mercer appealing the termination of her benefits. In reply, Mercer suggested that Mulder submit to an independent medical examination. That suggestion, according to the complaint, prompted appellant to write a note to Mercer's medical consultant stating that Mulder would be able to return to work on December 1, 1997.[3]

When the Mercer litigation commenced, appellant invoked Legion's duty to defend him under the terms of his insurance policy. That request was denied. On April 26, 1999, appellant filed an answer, and discovery commenced.

Nine months later, on January 29, 2001, Mercer and Marsh & McLennan filed a stipulation under seal stating that, "fol-

---

3. In December, Mulder filed suit in the Superior Court of the District of Columbia against Mercer and Marsh & McLennan for wrongful termination. The record does not disclose the outcome of that suit.

lowing extensive discovery and intense discussions between counsel ... plaintiffs' counsel has advised his clients of his opinion that the allegations that Dr. Moscarillo himself engaged in fraud or conspiracy to defraud with respect to his diagnosis and treatment of defendant Mulder or with respect to Mulder's application for disability benefits would likely be rejected by a finder of fact." On January 30, 2001, Mercer and Marsh & McLennan agreed to dismiss with prejudice their claims against appellant.

Thereafter, appellant demanded payment from appellees of the costs he had incurred during the Mercer litigation. On June 29, 2000, and October 15, 2001, PRMS, PCIGC, and Legion denied coverage of appellant's claim. Two years later, on July 28, 2003, Legion was declared insolvent by the Commonwealth Court of Pennsylvania.

## The Instant Case

On January 28, 2004, appellant filed suit against appellees PRMS, PCIGC, and Legion, seeking a declaratory judgment and damages for breach of contract arising out of Legion's refusal to reimburse him for the costs of the Mercer litigation. Eight months later, appellant filed a motion for partial summary judgment seeking a judicial declaration that appellees had a duty to defend him and that Legion, by failing to pay or reimburse appellant for his defense costs, had an unpaid obligation to him at the time it was declared insolvent. In response, appellees moved for summary judgment on the grounds that they had no duty to defend appellant in the Mercer litigation. Following a hearing on the cross-motions, the circuit court granted appellees' motion for summary judgment, prompting this appeal.

## Standard of Review

Summary judgment is appropriate only when, after viewing the motion and response in favor of the non-moving party, there is no genuine issue of material fact, and the party in whose favor judgment is entered is entitled to judgment as a matter of law. *Pittman v. Atl. Realty Co.*, 127 Md.App. 255,

269, 732 A.2d 912, *rev'd on other grounds,* 359 Md. 513, 754 A.2d 1030 (2000); Md. Rule 2–501(e). In short, when there is no genuine issue of material fact, our standard of review "is whether the trial court was legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990). In making that determination, "we do not accord deference to the trial court's legal conclusions." *Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24 (1998). In fact, we review the trial court's legal conclusions de novo. *See Matthews v. Howell,* 359 Md. 152, 162, 753 A.2d 69 (2000). Applying that standard to the instant case, we conclude, for the reasons set forth below, that the circuit court was legally correct in granting appellees' motion for summary judgment.

## Coverage

■ To determine whether an insurer has a duty to defend its insured in a tort suit, a court conducts a two-part inquiry: "(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage?" *St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 193, 438 A.2d 282 (1981). As the *Pryseski* Court noted, "The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit." *Id.*

■ To answer the first question, we look to the terms of the insurance policy to determine the scope of its coverage. *Aetna Cas. & Sur. Co. v. Cochran,* 337 Md. 98, 104, 651 A.2d 859 (1995). Because an insurance policy is essentially a contract, we construe it according to contract principles. *See Walk v. Hartford Cas. Ins. Co.,* 382 Md. 1, 14, 852 A.2d 98 (2004); *Litz v. State Farm Fire & Cas. Co.,* 346 Md. 217, 224, 695 A.2d 566 (1997). Thus, like other contracts, an insurance policy must be construed as a whole to determine the parties' intentions. *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617 (1995); *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766, 556 A.2d 1135 (1989). In doing so, words must be given their "customary, ordinary, and accepted meaning,"

unless there is some indication that the parties intended to use the words in a special sense. *Sullins,* 340 Md. at 508, 667 A.2d 617 (citations and internal quotation marks omitted).

■ The policy at issue provided that Legion had a "duty to defend any Claim or Suit against an Insured for Damages . . . payable under the terms of this policy." "Payable damages" were those resulting from a "Medical Incident," which was defined by the policy as "any negligent act or omission in the furnishing of Psychiatric Services." Giving the words of the policy their "customary, ordinary, and accepted meaning" it is clear that the policy covered negligent acts or omissions and not intentional torts, such as fraud and conspiracy to defraud, the gravamen of the Mercer complaint.

■ The second part of the *Pryseski* inquiry requires us to determine whether any of the claims in the Mercer litigation could potentially fall within the scope of the policy's coverage. *See Cochran,* 337 Md. at 105, 651 A.2d 859. If the plaintiff in the underlying action alleges a claim that is covered by the policy, the insurer has a duty to defend. *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 407, 347 A.2d 842 (1975). But even if the "plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." *Id.* at 408, 347 A.2d 842 (emphasis in original). To establish that "potentiality," when the underlying complaint "neither conclusively establishes nor negates a potentiality of coverage," an insured may use extrinsic evidence. *Cochran,* 337 Md. at 108, 651 A.2d 859. But "[t]his extrinsic evidence must . . . relate in some manner to a cause of action actually alleged in the complaint and cannot be used by the insured to create a new, unasserted claim that would create a duty to defend." *Reames v. State Farm Fire & Cas. Ins.,* 111 Md.App. 546, 561, 683 A.2d 179 (1996).

The Mercer complaint did not allege negligence. In fact, it is fair to say that there is not the slightest suggestion in the complaint that the tortious acts of appellant and his patient were anything but intentional and, in that regard, fraudulent.

 Nor did appellant raise, in his answer, negligence as a defense. In fact the issue of negligence was never raised by any party to the Mercer litigation. The only claims before the trial court were those for fraud and conspiracy to defraud, and those two torts have no elements in common with negligence.[4] Because appellees' "duty to defend any Claim or Suit against an Insured for Damages ... payable under the terms of this policy" encompassed only suits or claims alleging "negligent act[s] or omission[s]," allegations of fraud and conspiracy to defraud did not fall within the policy's coverage, and therefore appellees had no duty to defend appellant in that litigation.

Notwithstanding the plain language of the Legion policy, which extended coverage to only negligent acts and omissions, and the failure of both the Mercer complaint and appellant's answer to raise the issue of negligence, appellant contends that the Legion policy covered the *conduct* at issue in the Mercer litigation because Mercer had to prove, as part of its claim for fraud, that appellant's acts were negligent. That is, to prove "fraud," appellant reasons, Mercer had to first show that appellant had violated the standard of care and was thus

---

**4.** The elements of "negligence" are: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Rhaney v. Univ. of Md. Eastern Shore*, 388 Md. 585, 597, 880 A.2d 357 (2005); *see also Muthukumarana v. Montgomery County*, 370 Md. 447, 486, 805 A.2d 372 (2002).

In contradistinction, the elements of "fraud" are:
(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R*, 334 Md. 398, 415–416, 639 A.2d 660 (1994); *see also Everett v. Baltimore Gas & Elec.*, 307 Md. 286, 300, 513 A.2d 882 (1986); *Martens Chevrolet v. Seney*, 292 Md. 328, 333, 439 A.2d 534 (1982).

negligent. In other words, proving negligence was the first step in proving fraud.

But violating the standard of care is not necessarily tantamount to negligence. Indeed, violating the standard of care with the intent to deceive is evidence of fraud, not negligence. Nor does the affidavit of appellees' psychiatric expert, Sheldon S. Greenberg, M.D., provide, as appellant contends, what the Mercer pleadings omit: a claim, expressed or implied, of negligence.

Appellant asserts in his brief that Dr. Greenberg "opined that Dr. Moscarillo had been **negligent** in his treatment of Ms. Mulder." (Emphasis added). No such opinion was ever expressed by Dr. Greenberg in his affidavit or, for that matter, in any other document in the Mercer case. While Dr. Greenberg's affidavit did refer to "deviations from the standard of care," he was clearly referring to "intentional," not "negligent," deviations from the standard of care. Indeed, Greenberg asserted in his affidavit that appellant had improperly colluded with Mulder in diagnosing and treating her as well as in preparing and later supporting her claim for disability benefits. Specifically, he claimed that appellant became Mulder's "advocate, collaborator, enabler, and ally in the adversarial process" by distorting data, editing medical records, accepting a document from Mulder containing the answers he was to give her health care provider, and drawing conclusions wholly unsupported by clinical data. Appellant's motive, Greenberg suggested, was "to protect Mulder's financial interests."

Thus, contrary to appellant's claim, Dr. Greenberg's affidavit does not show that Mercer "pursued its case primarily by developing evidence of Dr. Moscarillo's alleged negligence in his evaluation and treatment of Ms. Mulder." Nor does Greenberg's deposition or his Federal Rule 26(a)(2)[5] report

---

5. Federal Rule of Civil Procedure 26(a)(2) states that a party must disclose to other parties the identity of any expert witness, and that expert witness must provide "a written report prepared and signed by the witness." It further states:

support that proposition, as appellant claims. In both, he repeated his claims of a "collusive collaboration" between appellant and Mulder. In fact, in the report, he flatly charged appellant with being a party to Mulder's deception and unethical conduct. Pointing to the "significant fee" appellant earned for the therapy Mulder received, he further suggested that appellant may "have been exploiting the situation for his own financial benefit." And his deposition testimony made many of the same points.

Because the "Greenberg evidence," that is, Greenberg's affidavit, report, and deposition testimony, is irrelevant to appellant's argument—that to prove fraud Mercer had to first prove negligence—there is no merit to appellant's claim that extrinsic evidence would have established what the complaint does not: that negligence was an underlying issue in the Mercer litigation. That is because the only extrinsic evidence appellant relies on is the Greenberg evidence, which, as we have noted, he largely misconstrues. Moreover, even if the Greenberg evidence was both suggestive of negligence and relevant—a doubtful proposition given that it does not "relate in some manner to a cause of action actually alleged in the complaint"—appellant's claim still founders.

To illustrate this point, we begin by assuming the validity of a proposition that we have already rejected, namely, that Mercer's complaint "neither conclusively establishes nor negates a potentiality of coverage," *Cochran,* 337 Md. at 108, 651 A.2d 859, and that, consequently, appellant may use extrinsic evidence to establish potentiality of coverage. As noted earlier, "[p]otentiality of coverage may be shown

> The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.
>
> Fed.R.Civ.P. 26(a)(2).

through the use of extrinsic evidence so long as the insured shows that there is a reasonable potential that the issue triggering coverage will be generated at trial." *Walk*, 382 Md. at 21, 852 A.2d 98. However, as this Court stated in *Reames v. State Farm Fire & Casualty Insurance:*

> This extrinsic evidence must . . . relate in some manner to a cause of action actually alleged in the complaint and cannot be used by the insured to create a new, unasserted claim that would create a duty to defend. Unasserted causes of action that could potentially have been supported by the factual allegations or the extrinsic evidence cannot form the basis of a duty to defend because they do not demonstrate "a reasonable potential that the issue triggering coverage will be generated at trial."

*Reames*, 111 Md.App. at 561, 683 A.2d 179 (quoting *Cochran*, 337 Md. at 112, 651 A.2d 859); *see also Walk*, 382 Md. at 21–22, 852 A.2d 98.

That is precisely what appellant wishes us to do here, namely, use the Greenberg evidence "to create a new, unasserted claim that would create a duty to defend." While some of Dr. Greenberg's statements may have referred to "deviations from the standard of care," as we noted earlier, those statements were made in the context of suggesting that appellant had improperly "collaborated" with his patient in coming up with a diagnosis to "protect [her] financial interests." The attempt to use extrinsic evidence "to create a new, unasserted claim that would create a duty to defend" was rejected by this Court in *Reames* and later by the Court of Appeals in *Walk*.

In the latter case, the Court of Appeals recited the language from *Reames* quoted above in rejecting the notion that a policy's coverage of damages resulting from an "advertising injury" encompassed the insured's violation of non-solicitation and severance agreements he had with his former employer, even though the violations may have "stem[med] from advertising activity on his part." 382 Md. at 13, 852 A.2d 98. After noting that the policy defined an "advertising injury" as including "the copying in an advertisement of an advertising

idea or style," *id.* at 6, 852 A.2d 98, the Court agreed with the insurer that there was "no allegation in the underlying action that Walk copied, in an advertisement, an idea for an advertisement or the style of an advertisement," *id.* at 13, 852 A.2d 98. Concluding that there was no reasonable potential that such a claim would have been generated at trial, the Court stressed, "[e]ven assuming that Walk's actions could have supported a claim of advertising injury by a hypothetical plaintiff, the plaintiffs never asserted such a claim in the instant case." *Id.* at 23–24, 852 A.2d 98.

And that is what occurred here. As we previously pointed out, neither Mercer's complaint nor appellant's answer nor, for that matter, any motion, statement, or paper filed in the Mercer litigation ever mentioned negligence. Therefore, the extrinsic evidence proffered by appellant, even if it had raised the issue of negligence, was not relevant because it did not "relate in some manner to a cause of action *actually alleged* in the complaint." *Reames,* 111 Md.App. at 561, 683 A.2d 179 (emphasis added). We therefore hold that the circuit court was correct in granting summary judgment in favor of appellees.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**