921 A.2d 245

**Frank M. MOSCARILLO**

v.

**PROFESSIONAL RISK MANAGEMENT SERVICES, INC., et al.**

**No. 61, Sept. Term, 2006.**

Court of Appeals of Maryland.

April 16, 2007.

Argued before BELL, C.J., RAKER,*WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

GREENE, J.

This appeal arises out of an action filed in the Circuit Court for Montgomery County by Petitioner, Dr. Frank Moscarillo ("Dr. Moscarillo"), against Respondents, Professional Risk Management Services, Inc. ("PRMS"), Property and Casualty Insurance Guaranty Corporation ("PCIGC"), and Legion Insurance Company ("Legion.") Dr. Moscarillo brought a declaratory judgement action that included allegations of breach of contract. Additionally, Dr. Moscarillo sought damages as a result of Legion's refusal to pay or reimburse the losses that he incurred in defending a lawsuit which had been filed against him. The Circuit Court denied Dr. Moscarillo's motion for partial summary judgment and granted Respondents' cross-motions for summary judgment, finding no duty to defend existed under Legion's policy (the "Policy") because the allegations against Dr. Moscarillo were related to intentional misconduct and not negligent conduct. On appeal, the Court of Special Appeals held that the Policy did not provide coverage for fraud. Additionally, that court held that the complaint and extrinsic evidence only supported a cause of action for fraud.

The issue we must decide in this case is whether Legion had a duty to defend Dr. Moscarillo in a lawsuit brought against him by William M. Mercer, Inc. and Marsh & McLennan Co., Inc. (collectively, "Mercer"). We hold that there was no duty to defend Dr. Moscarillo because there was no potentiality of coverage under the Policy. Accordingly, we shall affirm the judgment of the Court of Special Appeals.

## I.

We adopt the facts as stated by Judge Peter B. Krauser, writing for the Court of Special Appeals in this case:

On November 4, 1998, [Dr. Moscarillo] purchased a "claims-made" professional liability insurance policy from

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Legion, which was retroactive to May 1, 1996. It provided that Legion would "pay on behalf of an Insured all sums which the Insured shall become legally obligated to pay as Damages arising out of a Medical Incident, to which this policy applies." It further provided that Legion had a "duty to defend any Claim or Suit against an Insured for Damages which are payable under the terms of this policy, even if any of the allegations of such actions or proceedings are groundless, false, or fraudulent."

In the Legion policy, a "Claim" meant "a written demand received by an Insured for money including the service of Suit, demand for arbitration or the institution of any other similar legal proceeding to which this policy applies"; "Damages" included "any compensatory amount which an Insured is legally obligated to pay for any Claim to which this insurance applies"; and a "Medical Incident" encompassed "any negligent act or omission in the furnishing of Psychiatric Services by a Named Insured or any person for whose acts or omissions the Named Insured is legally responsible."

The Legion policy contained several exclusions, but only one is at issue here. That exclusion provided: "This policy does not apply to: ... [a]ny Claim arising out of or in connection with any dishonest, fraudulent, criminal, maliciously or deliberately wrongful acts or omissions, or violations of law committed by an Insured."

### The Mercer Litigation

On February 24, 1999, Mercer and Marsh & McLennan, Mercer's parent company, filed suit in federal district court against [Dr. Moscarillo] and his patient, Evelyn Toni Mulder, alleging fraud and conspiracy to defraud in connection with Mulder's application for and receipt of disability benefits. The complaint stated that Mercer hired Mulder as an actuary in 1992. On February 27, 1997, the head of Mulder's practice group, Henry Essert, met with Mulder to advise her that, as part of Mercer's restructuring plan, her office was to be closed. Two months later, he sent Mulder a

letter offering her a severance package and notifying her that her employment would end on May 31, 1997.

Two weeks after that letter was sent, on May 22, 1997, Mulder sought treatment from [Dr. Moscarillo,] a psychiatrist. She continued to see [Dr. Moscarillo] during the spring and summer of that year. During that time, [Dr. Moscarillo] prescribed Prozac and other antidepressants for her. By June, [Dr. Moscarillo] had concluded that Mulder was suffering from major depression. That diagnosis enabled Mulder to apply for and receive disability benefits under the Marsh & McLennan benefit plan.

According to the Mercer complaint, three weeks later, on June 23, 1997, Mulder told [Dr. Moscarillo] about the employment dispute she was having with Mercer. At that time, [Dr. Moscarillo] and Mulder "completed" Mulder's application for short-term disability benefits. The application stated that Mulder had major depression and had been unable to work since May 14, 1997. In July and August of 1997, [Dr. Moscarillo] purportedly told a disability coordinator and a health care consultant for Marsh & McLennan that Mulder had not yet recovered from that depression.

The Mercer complaint further alleged that on October 23, 1997, a senior Mercer human resources representative told Mulder that, consistent with Mercer's original decision, there was no longer any position for her at Mercer; her disability benefits were terminated effective November 1, 1997. On October 31st, the day before her benefits were to end, Mulder sent a letter to Mercer appealing the termination of her benefits. In reply, Mercer suggested that Mulder submit to an independent medical examination. That suggestion, according to the complaint, prompted [Dr. Moscarillo] to write a note to Mercer's medical consultant stating that Mulder would be able to return to work on December 1, 1997.[1]

---

1. In December, Mulder filed suit in the Superior Court of the District of Columbia against Mercer and Marsh & McLennan for wrongful termination. The record does not disclose the outcome of that suit.

When the Mercer litigation commenced, [Dr. Moscarillo] invoked Legion's duty to defend him under the terms of his insurance policy. That request was denied. On April 26, 1999, [Dr. Moscarillo] filed an answer, and discovery commenced.

Nine months later, on January 29, 2001, Mercer and Marsh & McLennan filed a stipulation under seal stating that, "following extensive discovery and intense discussions between counsel ... plaintiffs' counsel has advised his clients of his opinion that the allegations that Dr. Moscarillo himself engaged in fraud or conspiracy to defraud with respect to his diagnosis and treatment of defendant Mulder or with respect to Mulder's application for disability benefits would likely be rejected by a finder of fact." On January 30, 2001, Mercer and Marsh & McLennan agreed to dismiss with prejudice their claims against [Dr. Moscarillo].

Thereafter, [Dr. Moscarillo] demanded payment from [Legion] of the costs he had incurred during the Mercer litigation. On June 29, 2000, and October 15, 2001, PRMS, PCIGC,[2] and Legion denied coverage of [Dr. Moscarillo's] claim. Two years later, on July 28, 2003, Legion was declared insolvent by the Commonwealth of Pennsylvania.

\* \* \* \* \* \*

On January 28, 2004, [Dr. Moscarillo] filed suit against [Respondents] PRMS, PCIGC, and Legion, seeking a declaratory judgment and damages for breach of contract arising out of Legion's refusal to reimburse him for the costs of the Mercer litigation. Eight months later, [Dr. Moscarillo] filed a motion for partial summary judgment seeking a judicial declaration that [Respondents] had a duty to defend him and that Legion, by failing to pay or reimburse [Dr. Moscarillo] for his defense costs, had an unpaid obligation to him at the time it was declared insolvent. In response, [Respondents] moved for summary judgment on

---

**2.** Subject to certain statutory limitations, PCIGC stands in the shoes of Legion and is liable for claims that [Dr. Moscarillo] could have brought against Legion.

the grounds that they had no duty to defend [Dr. Moscaril-lo] in the Mercer litigation. Following a hearing on the cross-motions, the circuit court granted [Respondents'] motion for summary judgement....

*Moscarillo v. Professional Risk Mgmt. Services, Inc.,* 169 Md.App. 137, 141–44, 899 A.2d 956, 959–60 (2006). Dr. Moscarillo appealed the judgment of the Circuit Court to the Court of Special Appeals. On June 2, 2006, the Court of Special Appeals filed its reported opinion, *Moscarillo,* 169 Md.App. 137, 899 A.2d 956 (2006), holding that Legion did not have a duty to defend Dr. Moscarillo in the *Mercer* litigation. Dr. Moscarillo filed a petition for writ of certiorari[3] in this Court, which we granted. *Moscarillo v. Prof'l Risk Mgmt. Services, Inc.,* 394 Md. 479, 906 A.2d 942 (2006). For the reasons stated in this opinion, we affirm the judgment of the Court of Special Appeals.

## II.

### A.

We turn first to Dr. Moscarillo's assertion that Legion had a duty to defend him in the *Mercer* litigation, despite the fact that the allegations in that case were for fraud and conspiracy to defraud. Dr. Moscarillo argues that the duty to defend is not necessarily triggered by the mere titling or styling of a cause of action, but instead "the duty to defend is measured

---

3. Dr. Moscarillo presented two questions in his petition for writ of certiorari. We have rephrased the first question for purposes of clarity:

1. Whether, in this circumstance, the extrinsic evidence clearly established a reasonable potential that the issue triggering coverage under a professional liability insurance policy (here, negligent conduct) would be raised at trial. If so, did the Court of Special Appeals improperly hold that the duty to defend can be triggered only where the tort plaintiffs can also assert negligence as a cause of action, thus elevating form over substance and misapplying this Court's oft-cited test for the duty to defend?

2. Whether the "fraud" exclusion in a professional liability insurance policy can apply to unproven allegations of fraud, when by its express terms the exclusion applies to fraudulent acts "committed by an [i]nsured," and the policy imposes a "duty to defend" even as to allegations that are "groundless, false, or fraudulent."

first by gleaning the substance of the underlying tort action from the complaint and/or extrinsic evidence, and then evaluating whether there might be any potential for coverage under the terms of the insurance policy." Dr. Moscarillo further contends that "the Policy's coverage grant ... extends to negligent conduct" and that "Mercer aggressively sought to develop a record of negligent conduct against Dr. Moscarillo [and thus] the duty to defend was triggered." Legion argues, to the contrary, that the terms of the policy establish that Legion had no duty to defend Dr. Moscarillo in the Mercer litigation and that similarly, Dr. Moscarillo has failed to demonstrate that an issue triggering coverage would be generated at trial.

This Court has, on numerous occasions, discussed the duty of an insurer to provide a defense for an insured. The principles for determining whether an insurer has a duty to defend an insured were first set out in *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975). In *Brohawn* the issue before the Court was whether an insurer had a duty to defend an insured in a tort suit, brought by injured third parties, that alleged negligence and assault, when the policy excluded from coverage acts that were committed with the intent to injure. *Brohawn*, 276 Md. at 398, 347 A.2d at 844. In that case, the insured, Mary Brohawn, her son, and her sister, were involved in a physical altercation outside of a nursing home that resulted in Mrs. Brohawn and her sister pleading guilty to criminal assault charges. Later, the injured parties each filed a civil suit against Mrs. Brohawn and her sister alleging that they were assaulted and, in an amended declaration, alleged negligence. Mrs. Brohawn requested that her insurer, Transamerica, defend her in the civil suits. *Brohawn*, 276 Md. at 401, 347 A.2d at 846. The insurer, in response, filed a declaratory judgment action seeking a declaration that, because Mrs. Brohawn pled guilty in a criminal action, the acts she allegedly committed were intentional and therefore were excluded from coverage and, further, that Transamerica did not have an obligation to defend Mrs. Brohawn in the civil suits. We explained that, "[t]he

obligation of an insurer to defend its insured under a contract provision . . . is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend." *Brohawn,* 276 Md. at 407–408, 347 A.2d at 850 (citing *Journal Pub. Co. v. General Cas. Co.,* 210 F.2d 202, 207 (9th Cir.1954); *Boyle v. Nat'l. Cas. Co.,* 84 A.2d 614, 615–616 (D.C.Mun.App. 1951); *Travelers Ins. Co. v. Newsom,* 352 S.W.2d 888, 892 (Tex.Civ.App.1961); 7A Appleman *Insurance Law and Practice* § 4682; Annot., 50 A.L.R.2d 458). We noted that "[e]ven if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." *Brohawn,* 276 Md. at 408, 347 A.2d at 850 (*citing U.S. Fidelity & Guaranty Co. v. National Paving & Contracting Co.,* 228 Md. 40, 54, 178 A.2d 872 (1962)). The Court held that Mrs. Brohawn was entitled to a defense, noting that the allegations of negligence clearly stated a claim that was within the coverage of the policy and that the evidence of a guilty plea did not "relieve Transamerica of its duty to defend its insured in suits which allege an unintentional tort covered b y the policy." *Id.*

■ In *St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 438 A.2d 282 (1981), this Court further explained the rule for determining whether an insurer has a duty to defend its insured, establishing a two-part inquiry. The Court said that

> [i]n determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*Pryseski,* 292 Md. at 193, 438 A.2d at 285 (holding that, as the policy was presented in the record, there existed an ambiguity, and that ambiguity should be resolved against the insurer, St. Paul, because it is the party that prepared the contract.)

To determine if Legion had a duty to defend Dr. Moscarillo in the *Mercer* litigation, we turn to the first question of the *Pryseski* inquiry. Accordingly, we look to the terms of the professional liability insurance policy issued to Dr. Moscarillo to determine the scope of its coverage and any defenses. Dr. Moscarillo contends that the Policy creates a duty to defend when there is a potential for a payment arising out of negligent professional *conduct,* but that duty is not dependent on the plaintiff labeling the cause of action as negligence. Legion, in turn, consistent with the reasoning of the Court of Special Appeals, argues that the only "ordinary or reasonable interpretation of the coverage clause [is] that Legion is obligated to provide coverage for damages arising out of a negligent act or omission" and that because the "gravamen of the Mercer complaint" is fraud, Legion did not have a duty to defend Dr. Moscarillo.

The Policy we must interpret provides that Legion had the "duty to defend any Claim or suit against an Insured for Damages which are payable under the terms of th[e] Policy, even if any of the allegations of such actions or proceedings are groundless, false or fraudulent." Additionally, it provided that Legion "shall pay on behalf of an Insured all sums which the Insured shall become legally obligated to pay as Damages arising out of a Medical Incident to which th[e] policy applies...." The definitions section of the Policy defines a "Medical Incident" as meaning "any negligent act or omission in the furnishing of Psychiatric Services by a Named Insured or any person for whose acts or omissions the Named Insured is legally responsible. Any act or omission together with all related acts omissions shall be considered one Medical Incident." The Court of Special Appeals held that "it [was] clear that the policy covered negligent acts or omissions and not intentional torts." *Moscarillo,* 169 Md.App. at 146, 899 A.2d at

961. We agree with the intermediate appellate court's holding.

 We construe the professional liability insurance policy issued by Legion to Dr. Moscarillo according to contract principles, because a policy of insurance is a contract. *See Bausch & Lomb v. Utica Mut.,* 330 Md. 758, 779, 625 A.2d 1021, 1031 (1993); *Litz v. State Farm Fire & Cas. Co.,* 346 Md. 217, 224, 695 A.2d 566, 569 (1997), *Mesmer v. M.A.I.F.,* 353 Md. 241, 725 A.2d 1053 (1999). We have said:

> Construction of insurance contracts in Maryland is governed by a few well-established principles. An insurance contract, like any other contract, is measured by its terms unless a statute, a regulation, or public policy is violated thereby. To determine the intention of the parties to the insurance contract, which is the point of the whole analysis, we construe the instrument as a whole. Maryland Courts should examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.

*Litz,* 346 Md. at 224–225, 695 A.2d at 569 (citing *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985)). In the case *sub judice,* we are asked to interpret the contract and decide whether the insurer, Legion, had a duty to defend the insured, Dr. Moscarillo. As we noted in *Litz,* "[t]he insurer's duty to defend is a contractual duty arising out of the terms of a liability insurance policy." 346 Md. at 225, 695 A.2d at 569. The policy at issue also contained several "Exclusions," including an exclusion that provided that the "Policy does not apply to: . . . [a]ny claim arising out of or in connection with any dishonest, fraudulent, criminal, maliciously or deliberately wrongful acts or omissions, or violation of law committed by an Insured." Our reading of the policy as a whole, in light of the principles of construction, *supra,* according to the ordinary meaning of the words used, makes clear that the parties did not intend to cover any claim brought against Dr. Moscarillo that is based on an alleged fraudulent act or omission. The policy cannot be construed,

however, to exclude a claim that is based on an alleged negligent act. The definition of "Medical Incident" supports this conclusion. The policy clearly contemplates coverage in instances in which Dr. Moscarillo's actions are alleged to be negligent, but not where the conduct is alleged to be intentional or fraudulent. Thus, in answer to the first part of the *Pryseski* inquiry, we hold that the Policy before us obligated the insurer to defend the insured in an action that alleged negligence but not as here, where the pleadings in the *Mercer* litigation alleged only fraudulent conduct.

Accordingly, "[h]aving established the scope and limitations of coverage available under the [Legion] insurance polic[y]," as the Court of Special Appeals notes, "[t]he second part of the *Pryseski* inquiry requires us to determine whether any of the claims in the *Mercer* litigation could potentially fall within the scope of the policy's coverage." *Moscarillo*, 169 Md.App. 137, 146, 899 A.2d 956, 961 (2006) (citing *Aetna Cas. & Surety Co. v. Cochran*, 337 Md. 98, 105, 651 A.2d 859, 863 (1995)). As noted *supra*, the insurer must defend the insured if there is a potentiality that the claim could be covered by the insurance policy. *Brohawn*, 276 Md. at 408, 347 A.2d at 850.

In *Cochran*, this Court held that to establish a potentiality of coverage, an insured can also refer to extrinsic evidence. In that case, we concluded that, "[o]nly if an insured demonstrates that there is a reasonable potential that the issue triggering coverage will be generated at trial can evidence to support the insured's assertion be used to establish a potentiality of coverage under an insurance policy." *Cochran*, 337 Md. at 112, 651 A.2d at 866 (noting that the "facts sufficiently established a reasonable potential that a self-defense issue" would be generated at trial and therefore the insurer had a duty to defend the insured in the underlying tort action). We warned, however, that "an insured cannot assert a frivolous defense merely to establish a duty to defend on the part of his insurer." *Cochran*, 337 Md. at 112, 651 A.2d at 866.

Later in *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 852 A.2d 98 (2004), we limited the usage of extrinsic evidence to estab-

lish the potentiality of coverage. Dr. Moscarillo contends that, in its decision, the Court of Special Appeals "misapplied" this Court's decision in *Walk*. We disagree. In our view, *Walk* is dispositive and was correctly applied by the Court of Special Appeals.

Walk arose out of an action filed by Richard Walk against Hartford Casualty Insurance Company alleging breach of contract and seeking damages as a result of Hartford's refusal to defend him in a lawsuit which had been filed against him. Walk's employer, IBSC East, purchased a business insurance policy that provided coverage for "business personal property, business liability, and employment practices. . . ." *Walk*, 382 Md. at 6, 852 A.2d at 101. The insurer agreed to " 'pay those sums that the insured becomes legally obligated to pay as damages because of . . . [an] advertising injury.' " *Id.* An "advertising injury" was defined in the insurance policy as including "the copying in an advertisement of an advertising idea or style." *Id.* Prior to his employment with ISBC, Walk was employed by Schinnerer, a company that, like ISBC, acted as an underwriter for liability insurance policies for professionals. While employed by Schinnerer, Walk focused on marketing to real estate agents errors and omissions insurance.

The underlying actions instituted by Schinnerer, against Walk, alleged, *inter alia*, that Walk "breached non-solicitation and severance agreements by soliciting Schinnerer's clients and using proprietary and confidential information. . . ." *Walk*, 382 Md. at 8, 852 A.2d at 102. Because the complaint did not imply or explicitly allege an advertising injury, Walk relied on extrinsic evidence in support of his argument that a potentiality of coverage existed. Specifically, Walk relied on his deposition testimony, Schinnerer's answers to interrogatories in the underlying suit, and a settlement demand letter. The crux of Walk's argument was that "Schinnerer's claim potentially was covered by the Policy because Schinnerer's allegations that he violated the non-competition agreements stem from the advertising activity on his part." *Walk*, 382 Md. at 13, 852 A.2d at 105. The insurer argued that Walk's marketing efforts were

not advertisements and that if they were, the plaintiff in the underlying suit never "alleged anything with respect to the *content* of such advertisements and mentioned Walk's marketing efforts merely to prove that Walk breached contracts prohibiting him from soliciting Schinnerer's clients." *Walk,* 382 Md. at 14, 852 A.2d at 105.

In *Walk* we said that extrinsic evidence

> must ... relate in some manner to a cause of action *actually alleged* in the complaint and cannot be used by the insured to create a new, unasserted claim that would create a duty to defend. Unasserted causes of action that could potentially have been supported by the factual allegations or the extrinsic evidence cannot form the basis of a duty to defend because they do not demonstrate "a reasonable potential that the issue triggering coverage will be generated at trial."

*Walk,* 382 Md. at 21–22, 852 A.2d at 110 (quoting *Reames v. State Farm Fire and Cas. Ins.,* 111 Md.App. 546, 561, 683 A.2d 179, 186 (1996)). We concluded that Walk stretched the concept of potentiality too far, as general references to the marketing materials did not transform the claims into ones for advertising injuries. We held that "[b]ecause Schinnerer never asserted that anything was copied in an advertisement, Walk [could not] establish a potentiality of an advertising injury or the reasonable potential that the issue of an advertising injury would have been generated at trial." *Walk,* 382 Md. at 22, 852 A.2d at 110.

In the case *sub judice,* the *Mercer* complaint contained two separate counts against Dr. Moscarillo alleging the intentional torts of fraud and conspiracy to defraud. The allegations in the complaint contain no averments or intimations that the injury sustained by Mercer resulted from the negligent acts of Dr. Moscarillo, which would potentially bring the alleged intentional acts under the policy's coverage. Thus the allegations in the complaint filed in the Mercer action do not trigger coverage under the insurance policies.

We turn, then, to the extrinsic information that Dr. Moscarillo contends supports his position that Legion had a duty to defend him. Specifically, Dr. Moscarillo contends that "the affidavit, reports, and deposition testimony of Mercer's psychiatric expert, Sheldon Greenberg, M.D., opined that Dr. Moscarillo had rendered an incorrect diagnosis and, in caring for Ms. Mulder, had committed the equivalent of malpractice" and further that "[b]ased on Dr. Greenberg's conclusion, Mercer alleged in several pleadings that Dr. Moscarillo had committed the equivalent of malpractice." Legion contends that Dr. Greenberg's opinions were insufficient to establish that Mercer was asserting a claim for negligence or that it would have made negligence an issue at trial and, further, that "his opinions were offered solely for the purpose of proving an element or elements of fraud and conspiracy to commit fraud." We agree with Legion.

 At the outset, we note that

[i]n order to recover damages in an action for fraud or deceit [Mercer was required to] prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R,* 334 Md. 398, 415–416, 639 A.2d 660, 668–669 (1994) (citing *Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 300, 513 A.2d 882, 889 (1986); *Martens Chevrolet v. Seney,* 292 Md. 328, 333–334, 439 A.2d 534, 537–538 (1982); *James v. Weisheit,* 279 Md. 41, 44–45, 367 A.2d 482, 484–485 (1977); *Suburban Properties Mgmt., Inc. v. Johnson,* 236 Md. 455, 460, 204 A.2d 326, 329 (1964); *Schmidt v. Millhauser,* 212 Md. 585, 592–593, 130 A.2d 572, 575–576 (1957); *Appel v. Hupfield,* 198 Md. 374, 378–379, 84 A.2d 94, 95–96 (1951); *Gittings v. Von Dorn,* 136 Md. 10, 15–16, 109 A. 553, 554–555 (1920);

*Donnelly v. Baltimore Trust & Guarantee Co.*, 102 Md. 1, 13, 61 A. 301, 306 (1905); *Boulden v. Stilwell,* 100 Md. 543, 552, 60 A. 609, 610 (1905); *Cahill v. Applegarth,* 98 Md. 493, 499–504, 56 A. 794, 795–797 (1904); *Robertson v. Parks,* 76 Md. 118, 131–133, 24 A. 411, 412–413 (1892); *McAleer v. Horsey,* 35 Md. 439, 452–454 (1872)). *See also Hoffman v. Stamper,* 385 Md. 1, 867 A.2d 276 (2005). In the alternative, if Mercer intended to prove an allegation of negligence, it would have to show "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Rhaney v. Univ. of Maryland Eastern Shore,* 388 Md. 585, 596, 880 A.2d 357, 363–64 (2005); *see also Muthukumarana v. Montgomery County,* 370 Md. 447, 486, 805 A.2d 372, 395 (2002). We conclude, as discussed *infra,* that Legion presented evidence that Dr. Moscarillo breached the standard of care in an attempt to establish that Dr. Moscarillo made a false representation (and his conduct was therefore fraudulent), not to establish that Dr. Moscarillo's conduct w as negligent.

Dr. Greenberg's affidavit, in our view, does not support Dr. Moscarillo's contention that negligence would have been made a central issue at trial. The Court of Special Appeals correctly noted that "[w]hile Dr. Greenberg's affidavit did refer to 'deviations from the standard of care,' he was clearly referring to 'intentional,' not 'negligent,' deviations from the standard of care." *Moscarillo,* 169 Md.App. at 148, 899 A.2d at 963. The following excerpts from Greenberg's affidavit, in our view, supports this conclusion:

- The amelioration of Mulder's symptoms and her high level of functioning suggest manipulative behavior. This suggests a disingenuous presentation or overemphasis of symptoms to a psychiatrist for the purposes of secondary gain, in this case, disability payments. . . .
- The impressions that Dr. Moscarillo had given regarding Mulder's functional capacity are suspect because of the unusual clinical interaction that occurred in the relation-

ship with this patient. . . . The records show an unusual degree of involvement by the patient, and an unusual collaboration between the psychiatrist and the patient in developing a certain clinical picture, which essentially distorted the fundamental diagnosis. . . .

- Dr. Moscarillo's statement in the disability application that Ms. Mulder was disabled raises questions about his motivation, his alliance, his boundaries, with this patient and it highlights what the therapeutic alliance between Dr. Moscarillo and Ms. Mulder had been at that time. The doctor is not supposed to be in alliance with the patient against a company and should not change his objective findings in disability evaluations. . . .

- I conclude that Dr. Moscarillo was attempting to protect Mulder's financial interests and to offer her some kind of protection by filling out the disability application to indicate that Mulder was disabled and unable to work. . . .

- I conclude that Dr. Moscarillo clearly failed to maintain the appropriate boundaries; I think his clinical judgment was affected by his unusual alliance with this patient. Dr. Moscarillo allowed Mulder to unduly influence his decisions, and his treatment of Mulder, including what he put on the disability forms. Dr. Moscarillo's behavior raises serious questions about his objectivity in his treatment of Mulder. . . .

- This suggests that Dr. Moscarillo distorts the data for his patient rather than ascertain the truth and arrive at a therapeutic diagnosis that fits the data. . . .

- This is further evidence of a collaborative collusive relationship against the corporation, Mulder's former employer. . . .

- Mulder also inappropriately coached Dr. Moscarillo when she gave him a typewritten document which contained answers to United Healthcare's questions. That is unheard of and Dr. Moscarillo appeared to accept Mulder's answers, without questioning her. . . .

Dr. Greenberg's affidavit, viewed as a whole, and as evidenced by the above cited portions, indicates Mercer intended to lay the foundation for fraud and not to prove a case of negligence. Accordingly, contrary to Dr. Moscarillo's urging, Dr. Greenberg's affidavit does not establish a reasonable potential that the issue of negligence would have been generated at trial. Similarly, Dr. Greenberg's deposition testimony laid the foundation for a compensable claim of fraud or conspiracy to defraud but did not provide evidence that negligence would have been a central issue at trial.[4]

---

4. The following excerpts from the transcript support our conclusion that Dr. Greenberg's deposition does not establish a reasonable potential that the issue of negligence would be raised at trial:

Q: And how did that paragraph come to bear on your opinions in the Mercer case?
A: Well, without having spoken to Dr. Moscarillo, the question comes up was he facing an ethical dilemma or did he was he even considering the ethical questions in some of his behavior. . . .
Q: And what's your opinion in that regard?
A: It's not reflected in his notes. I didn't recall seeing it reflected in his deposition, so the—it is not clear what his attitude or thoughts were to the ethics of the situation. . . .
Q: What does th[e] term [therapeutic alliance] mean to you?
A: Well, in the context of the treatment of Dr. Moscarillo with Ms. Mulder, an appropriate therapeutic alliance would have been to do what is right for and with the patient. A doctor must maintain his credibility, objectivity, his honesty, his integrity, that if a patient, for instance, is wrong in her evaluation of the situations or has distortions about the world, if you will, a doctor has a responsibility to work through those issues. And essentially the doctor has to maintain a position of—consistent with ethics and appropriate psychiatric discipline and honesty. . . .
Q: Okay. In what regard was he a collaborator?
A: He essentially went along with what she—what he believes she wanted at that time and what he may have believed that she was requesting of him rather than what might have been in her best therapeutic interests. . . .
Q: Well, maybe I'll rephrase the question. Do you see in Dr. Moscarillo's section of the disability application which is on the final page, do you see evidence there that she was in active collaborator in preparing the wording of that document?
A. No. I do not see any evidence of any "active" collaboration per se, but there's an appearance of an *unusual degree of collaboration* between the doctor and patient in the preparation of this document. (Emphasis added).

Dr. Moscarillo also points to Dr. Greenberg's written report, filed in the Mercer litigation, arguing that the report supports his claim that negligence would be made a central issue at trial. Specifically, Dr. Greenberg noted that he found that "[s]erious questions are to be raised regarding the diagnosis, authenticity, reliability and validity of the clinical findings." The Court of Special Appeals correctly observed that Dr. Greenberg

> repeated his claims of a "collusive collaboration" between [Dr. Moscarillo] and Mulder. In fact, in the report, he flatly charged [Dr. Moscarillo] with being a party to Mulder's deception and unethical conduct. Pointing to the "significant fee" [Dr. Moscarillo] earned for the therapy Mulder received, he further suggested that [Dr. Moscarillo] may "have been exploiting the situation for his own financial benefit."

*Moscarillo*, 169 Md.App. at 149, 899 A.2d at 963. Dr. Greenberg's report, in our view, supports only the allegations in the complaint, allegations of fraud and conspiracy to defraud.

Lastly, Dr. Moscarillo points to pleadings filed in the Mercer litigation as extrinsic evidence that there was a potentiality that negligence would have been a central issue at trial. Evaluating each pleading in its totality, we conclude that, although the various pleadings contained language that "Dr. Moscarillo's claimed diagnosis of 'Major Depression' is medically unsupportable and contrary to the accepted standards of care and practice in psychiatry," each filing advanced a cause of action for fraud. In *Walk*, we warned that "pulling stray phrases out of ... letters and discovery" does not act to transform allegations into coverage triggering claims. *Walk*, 382 Md. at 13, 852 A.2d at 105. In this case, Dr. Moscarillo did just that, pulling stray phrases from the extrinsic materials, inappropriately asserting that they are evidence of negligence.[5] We have, as suggested by Dr. Moscarillo, gleaned the

---

5. From the record presented to this Court for review, it appears unlikely that Mercer would have had standing to bring an action for negligence against Dr. Moscarillo.

substance of the underlying tort action from the complaint and extrinsic evidence. That substance, however, suggests that the only issue to be tried was one of fraud. Moreover, the extrinsic evidence presented in this case does not relate to a cause of action *actually alleged* in the complaint. Despite the warning in *Walk*, Dr. Moscarillo imagines a new, unasserted claim, specifically, negligence. And, as we noted in *Walk*, an argument that an unasserted cause of action, even if it could potentially have been supported by the factual allegations or the extrinsic evidence, cannot form the basis of a duty to defend. Dr. Moscarillo's contention is of that variety. We see no compelling reason to discontinue our adherence to *Walk*. Accordingly, we hold that the extrinsic evidence to which Dr. Moscarillo points fails to establish the potentiality that negligence would be an issue at trial.

## B.

We next turn to Dr. Moscarillo's assertion that the fraud exclusion contained in the professional liability insurance policy issued by Legion is inapplicable and therefore does not discharge the insurer's duty to defend. Dr. Moscarillo's argument is that the fraud exclusion does not apply to exclude coverage because allegations of fraud are insufficient to trigger the exclusion and that the exclusion denies only indemnity for proven acts of fraud, but has no effect on the duty to defend. Legion argues, however, that the plain language of the Policy, when applied to the facts of this case, excludes coverage. We agree with Legion.

Dr. Moscarillo's argument focuses on the fraud exclusion, specifically, the word "committed." Dr. Moscarillo contends that by use of the past tense, Legion has limited the fraud exclusion to scenarios in which the act of fraud has been proven. Dr. Moscarillo's argument follows, then, that the exclusion does not apply to alleged acts of fraud. In support of his contention, Dr. Moscarillo points to other exclusions contained within the insurance policy, noting that some of those exclusions specifically exclude claims that are "real or

alleged" and in contradistinction, the fraud exclusion does not use this temporizing language.

We interpret the Policy and its "fraud exclusion" in conformity with the well settled principles of contract interpretation discussed, *supra.* In the case before us, the exclusion reasonably may be read as intending to exclude coverage for claims of fraud, whether they are proven or unproven. The "Exclusions" subheading indicates that the Policy does not apply to any of the situations outlined in the paragraphs that follow. Specifically, the entire policy does not apply "to any Claim arising out of or in connection with any dishonest, fraudulent, criminal, maliciously or deliberately wrongful acts or omissions, or violations of law committed by an Insured." We find Dr. Moscarillo's interpretation of the exclusion to be inconsistent with the plain language of the exclusion. Under Dr. Moscarillo's theory, Legion would have a duty to defend Dr. Moscarillo in all cases in which allegations are made that Dr. Moscarillo's conduct was dishonest, fraudulent, criminal, malicious or deliberately wrongful. In our view, this is precisely the sort of conduct the policy sought to exclude from coverage; claims of intentional conduct, whether finally adjudicated or not. We have said in the context of interpreting an exclusionary clause in an insurance contract that, in determining whether an individual's liability is within the coverage of the policy, the terms of an insurance policy determine the reach and extent of its coverage. *Aragona v. St. Paul Fire & Marine Ins. Co.,* 281 Md. 371, 379–80, 378 A.2d 1346, 1351 (1977)(noting that as to exclusionary clauses in insurance contracts that "the insurance carrier contracted to underwrite a specific coverage and should not subsequently be expected to assume liability for a risk which it expressly excluded") (citations omitted). Accordingly, we hold that the Policy excluded from coverage the conduct alleged in this case. Therefore, Legion had no duty to defend or indemnify Dr. Moscarillo.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**